**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**CIVIL NO. 1:07CV335**

| | | |
|---|---|---|
| **STEPHEN W. WALKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM AND** |
| | ) | **O R D E R** |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ——————————————— | ) | |

**THIS MATTER** is before the Court on Plaintiff's motion for judgment

on the pleadings, construed by the Court as a motion for summary

judgment, and the Defendant's motion for summary judgment. For the

reasons stated below, Plaintiff's motion is allowed and the Commissioner's

decision denying benefits to the Plaintiff is reversed.


**I. STANDARD OF REVIEW**

Review by this Court of a final decision of the Commissioner is

limited to whether there is substantial evidence in the record to support the

decision. **42 U.S.C. § 405(g)**; ***Richardson v. Perales*, 402 U.S. 389, 390,**

**401 (1971)**. A finding by the Commissioner is supported by substantial evidence where there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also review whether the correct legal standards were applied by the Commissioner in making his decision. *Hays v. Sullivan*, **907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990);** *see also, Craig v. Chater*, **76 F.3d 585, 589 (4ᵗʰ Cir. 1996).** Where a decision is supported by substantial evidence, the Court may not supplant its judgment for that of the Commissioner. *Id.* The Administrative Law Judge (ALJ) and not the Court has the ultimate responsibility for weighing the evidence and resolving its conflicts. *Hays,* **907 F.2d 1456.** Thus, the issue for resolution here "is not whether [Plaintiff] is disabled, but whether the ALJ's finding that [he] is not disabled is supported by substantial evidence and was reached upon a correct application of the relevant law." *Craig*, **76 F.3d at 589.**

The Plaintiff has moved for judgment on the pleadings, which is construed by the Court as a motion for summary judgment; Defendant has also moved for summary judgment. Summary judgment is appropriate when there is no genuine issue of material fact to be decided by the fact finder at trial. **Fed. R. Civ. P. 56(c).** A genuine issue of material fact exists

where a reasonable jury considering the evidence could reasonably return a verdict in favor of the non-moving party. *Shaw v. Stroud*, **13 F.3d 791, 798 (4ᵗʰ Cir. 1994).** Summary judgment is appropriate when there is no substantive issue of material fact and an "inquiry into the facts is not desirable to clarify the application of the law." **Fed. R. Civ. P. 56(c);** *Miller v. Federal Deposit Ins. Corp.***, 906 F.2d 972, 974 (4ᵗʰ Cir. 1990) (citing** *Charbonnages de France v. Smith***, 597 F.2d 406, 414 (4ᵗʰ Cir. 1979)).** In making its determination, the Court must make all factual inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 587-88 (1986).**

## II. PROCEDURAL HISTORY

Plaintiff was born October 27, 1956, and at the time of the alleged onset of disability, was a "younger individual." **Transcript of Proceedings ("Tr."), filed February 1, 2008, at 19, 303.** He applied for a period of disability and disability insurance benefits on January 22, 2004, alleging an onset date of July 8, 2003. *Id***. at 44-47.** His claim was denied initially and upon reconsideration. *Id***. at 13, 29-37.** At his request, a hearing was held on April 19, 2007, before an ALJ. On June 4, 2007, the ALJ issued a

decision denying Plaintiff's claim. *Id*. **at 10-21.** This decision was appealed to the Appeals Counsel who affirmed the ALJ's decision by denying Plaintiff's request for review. *Id*. **at 5-7, 9, 298-99.** The denial of review by the Appeals Council was followed by the filing of this action on October 18, 2007, seeking review by this Court under the provisions of 42 U.S.C. § 405(g). Therefore, having exhausted his administrative remedies, this Court has jurisdiction over this matter pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

### III.  STATEMENT OF FACTS

Plaintiff testified that he received his GED, but had taken no additional courses or received any other training. *Id.* **at 304.** He has not worked since July 8, 2003, when he was hospitalized after suffering a collapsed lung. *Id.* At that time, he had been working as a shipping clerk for Eflex, a textile manufacturer, for about seven months. *Id.* **at 305.** This job required him to be on his feet most of the day and lift rolls of cloth weighing up to 120 pounds. *Id*. This is the same job he had held for over 22 years with Cleveland Mills, who had gone out of business for a time and was purchased and reopened by Eflex. *Id.* **at 307.** For eight months prior

to the shipping clerk's position, he worked for a home repair company.  *Id.* **at 306.**  Likewise, this job required him to be on his feet most of the day and to lift up to 100 pounds.  *Id.*

Plaintiff testified that he experienced his first lung collapse in July 2002.  *Id.* **at 308.**  After discharge from the hospital where his lung was reinflated, he returned to work at Cleveland Mills.  *Id.*  When the lung collapsed a second time, he underwent major surgery.  *Id.* **at 308-09.**  Since the surgery, he has experienced shortness of breath when any type of exertion is attempted.  *Id.* **at 309.**  He also testified that he becomes short of breath when around heavy perfumes, "gassy" smells, dust, pollen, strong dish detergents, and strong cleaning solutions such as Clorox.  *Id.* **at 309-10.**  He also testified that he uses a C-PAP machine during the day as well as at night to assist his breathing.  *Id.*  The Plaintiff testified that he had quit smoking just before the first lung collapse and has not smoked since that time.  *Id.* **at 310.**  The Plaintiff also testified that he suffers from rheumatoid arthritis in "all areas," especially in his hands, feet, knees and back.  *Id.* **at 311.**  He testified that he has difficulty grasping and holding on to things with his hands; he also testified that the rheumatoid arthritis causes tenderness and swelling in the joints along with intense pain on the

level of 6 to 7 using a scale of 1 to 10, 10 being the most severe. *Id*. **at 311-12, 315.** He also testified that although he takes medication to manage his pain, such medication does not entirely alleviate the pain. *Id*. **at 312.** He also testified that once a month, he undergoes an intravenous infusion of Orencia for the rheumatoid arthritis in his back. *Id*. **at 313-14.** He further testified that he experiences muscle spasms at the site of his lung surgery from time to time and he has a hearing deficit in the left ear. *Id*. **at 315.** He drives a car occasionally, does some house work and laundry, but spends most of his time reading or watching television. *Id*. **at 317-20.** The rheumatoid arthritis in his back is alleviated temporarily by the infusions, but the condition has never been in remission. *Id*. **at 320.** He testified that he walks about a half mile a day on the advice of his doctors, but experiences pain in his knees if he attempts to go up or down stairs. *Id*. **at 322-23.** The Plaintiff also testified that he can dress himself and otherwise take care of his personal needs. *Id*. **at 325.** The Plaintiff's sister-in-law also testified at the hearing and her testimony essentially corroborated in detail Plaintiff's testimony as to his daily habits, breathing difficulty, arthritic limitations, and pain. *Id*. **at 327-31.**

A vocational expert also attended the hearing and testified.  The expert testified that Plaintiff's job as a shipping clerk would be that of a medium level, skilled job and his work as a home repairman would be classified as heavy and semi-skilled.  ***Id*. at 332.**  The vocational expert further testified that Plaintiff's shipping clerk skills were transferable to that of a tool crib attendant, parts orderer and/or stock clerk.  *Id*.  She also testified that there are some 7,000 jobs of this type in North Carolina and several thousand nationwide.

The ALJ then posed a hypothetical question to the vocational expert, asking her to assume Plaintiff's exertional impairments would permit sedentary and light work on a sustained basis; that he could not tolerate being exposed to significant amounts of dust, fumes, chemicals, smoke, pollutants, or extreme changes of temperature; he would not be able to perform jobs that required frequent or repetitive climbing, balancing, bending, stooping, or squatting; and that Plaintiff suffered from a degree of chronic pain that was severe enough to rule out sustained skilled concentration, thereby limiting him to unskilled or semi-skilled work; and assuming a person of Plaintiff's age, education, and prior relevant work experience, would there be jobs available that could be performed by a

person with those limitations.  *Id*. **at 333.**  The vocational expert responded that based on the assumptions posed by the ALJ, Plaintiff could not perform his past relevant work as a shipping clerk due to the level of skill required, and the fact that the job required climbing and was typically located in dirty environments.  *Id*.  However, it was her opinion that other light, sedentary jobs could be performed such as a ticket taker in amusement businesses such as museums; a storage facility rental clerk, and a routing clerk for charitable organizations where trucks are dispatched to pick up donated items.  *Id*. **at 333-34.**  She also testified that each of these jobs existed in significant numbers in North Carolina and in the national economy.  *Id*.

Next, the ALJ asked the vocational expert to assume that Plaintiff possessed the degree of physical limitations as shown on the residual functional capacity assessment completed March 14, 2007, would Plaintiff be able to perform any of the jobs previously cited.  *Id*. **at 335-36;** *see also* *id*. **at 280-82.**  The vocational expert testified that, based on those limitations, the Plaintiff could not perform those jobs previously cited or any other "competitive work."  *Id*. **at 335.**

The Plaintiff's attorney asked the vocational expert that assuming Plaintiff possessed the degree of physical limitations shown on the residual functional capacity assessment completed September 1, 2004, by Dr. Kirby, Plaintiff's rheumatologist, would he be able to perform any of the jobs previously cited. *Id*. at 336; *see also id*. at 158-60. The vocational expert testified that there would be no type of full time work the Plaintiff would be able to perform. *Id*. at 336.

Plaintiff's medical history reveals that in July 2002, he was hospitalized at Cleveland Regional Medical Center suffering from spontaneous right pneumothorax[1] and underwent a right tube thoracostomy.[2] *Id*. at 104. After the procedure, the penumothorax resolved and he was discharged. *Id*. A year later on July 13, 2003, he was again admitted to Cleveland Regional hospital complaining of shortness of breath, cough and pain in the right side of his chest. *Id*. Initial x-rays upon his admission revealed 50 percent penumothorax. *Id*.

---

[1] "[A]n accumulation of air in the pleural space [of the lung], which may occur spontaneously[.]" *Dorland's Illustrated Medical Dictionary, at 1319 (28th ed.).*

[2] "[S]urgical creation of an opening in the wall of the chest for the purpose of drainage.[.]" *Dorland's, supra*, at 1705.

He was admitted to the hospital and a thoracostomy performed. *Id*. A CAT scan of the chest on July 15, 2003, revealed paraseptal emphysema[3] with multiple blebs (*i.e.*, blisters) in both upper lobes, but much worse in the right lung. *Id*. **at 100.** On July 17, 2003, he was to undergo a right thoracoscopy[4] and removal of the blebs; however, the blebs were found to be too large to excise with the endoscope used for that procedure. *Id*. Instead, Plaintiff's surgeon, Dr. Robert G. Laney, opted for an open posterior lateral thoracotomy[5] which successfully resected multiple large blebs. *Id*. He was discharged on July 25, 2003, and Vicodin was prescribed as needed for pain. *Id*. **at 101.** Subsequent chest x-rays taken monthly from August 1 through October 29, 2003, were within normal limits. *Id*. **at 94-98.** The record shows Plaintiff saw Dr. Laney on a monthly basis after his surgery through January 2004. *Id*. **at 132-36.** In his notes from the December 18, 2003, Dr. Laney noted that the Plaintiff complained

---

[3] "Alveolar distention localized to the lung periphery[.]" ***Dorland's, supra,* at 546.**

[4] "[D]irect examination of the pleural cavity by means of the endoscope." ***Dorland's, supra*, at 1705.**

[5] A surgical incision of the wall of the chest, entering from the back. ***Dorland's, supra*, at 1705.**

of increasing difficulty with his rheumatoid arthritis and shortness of breath and stated he was unable to return to work due to these conditions. *Id.* at **134.** Dr. Laney concluded that the Plaintiff "has never given the impression that he is [malingering] and I certainly believe he would be back at work if he were physically able to do so." *Id.*

On January 9, 2004, the Plaintiff was seen by Dr. Gideon Besson, a specialist in pulmonary diseases, critical care, and sleep disorders, on referral from Dr. Laney in order to monitor Plaintiff's lung disease after the surgery. *Id.* **at 207-34.** Plaintiff reported that he suffered from shortness of breath on exertion, that he had "coughing fits" which induced vomiting; that he had difficulty sleeping; and that he suffered pain in his joints due to his arthritis. *Id.* **at 227-28.** It was Dr. Besson's impression that Plaintiff was suffering from obstructive lung disease as well as rheumatoid arthritis. *Id.* **at 227.** Results of pulmonary function studies conducted February 11, 2004, revealed "severe air trapping . . . with hyperinflation[6] looking more like an emphysematous[7] pattern." *Id.* **at 222 (footnotes added).** Dr.

_____

[6] The "excessive inflation or expansion [of the lungs]; overinflation." ***Dorland's, supra*, at 795.**

[7] "[O]f the nature of or affected with emphysema." ***Dorland's, supra*, at 546.**

Beeson prescribed Combivent to treat the Plaintiff's lung disease.  *Id*.  On

June 10, 2004, the Plaintiff again saw Dr. Beeson in follow-up, at which

time he was prescribed a Spiriva inhaler in an attempt to improve his

pulmonary function studies and hyperinflation as the Combivent had

proved ineffective.  *Id*. **at 221.**  Dr. Beeson noted that this medication "may

be profoundly beneficial if [Plaintiff] has a good response."  *Id*.  Plaintiff

was also advised to continue his prescribed treatment for the rheumatoid

arthritis.  *Id*.  At the July 9, 2004, follow-up appointment, Plaintiff reported

that the Spiriva had made a difference in his breathing and had helped

more than other medications he had taken.  *Id*. **at 216.**  Because he felt

there was more room for improvement in treating Plaintiff's disease, Dr.

Beeson added the medication Advair.  *Id*.  At the appointment on July 30,

2004, Dr. Beeson noted that pulmonary function studies performed that

day showed "resolution of previously identified hyperinflation" and that

Plaintiff's breathing was somewhat improved with the use of the Spiriva

treatment.  *Id*. **at 212.**  During the month of October 2004, Plaintiff visited

Dr. Beeson twice, complaining of pain in his back and on his right side.  *Id*.

**at 209-10.**  He advised Dr. Beeson that he had been seen in the

emergency room for this pain and had been given Hydrocodone, but that

did not seem to help.  *Id*. **at 210.**  Because chest x-rays were negative, Dr.

Beeson suspected the Plaintiff was experiencing muscle spasms and

prescribed the medication Soma.  *Id*.  During the November 22, 2004, visit,

Dr. Beeson noted that the Plaintiff's breathing had improved as well as his

energy level and that the improvement may have been due in part to

Plaintiff's Enbrel therapy for his rheumatoid arthritis.  *Id*. **at 208.**  Dr.

Beeson noted that the previous diagnosis of obstructive lung disease was

"probably obliterative bronchiolitis.[8]"  *Id*. **(footnote added).**

The Plaintiff next saw Dr. Beeson in February 2005.  Pulmonary

function studies performed at that time showed his "total lung capacity . . .

to have doubled," and Dr. Beeson questioned whether Plaintiff's condition

had worsened or whether there was a machine malfunction.  *Id*. **at 293.**  In

any event, Dr. Beeson increased the Prednisone dosage and Plaintiff was

to return in two weeks.  *Id*.  Plaintiff returned as scheduled on March 9,

2005, where Dr. Beeson noted some improvement with the increased

dosage of Prednisone and the repeated pulmonary function studies were

"just about normal."  *Id*. **at 292.**  At his visit in April 2005, Plaintiff

---

[8] Destructive "inflammation of the bronchioles" of the lung.
***Dorland's, supra*, at 230.**

complained of chest pain on the right side and coughing spells when going to bed at night. *Id*. at 290. Dr. Beeson reviewed the CT scan taken of Plaintiff's chest area on April 15, 2005, and noted that no pneumothorax or other changes were identified. *Id*. Dr. Beeson suspected the Plaintiff was suffering from pleurisy,[9] a probable postnasal drip syndrome, and sleep apnea (although Plaintiff denied any significant symptoms). *Id*. At his 4-month follow-up visit, Plaintiff complained of fatigue and excessive daytime sleepiness; he also reported that his breathing had been stable. *Id*. at 289. Dr. Beeson recommended the Plaintiff undergo a sleep study to confirm his diagnosis of sleep apnea. *Id*.

On January 3, 2006, Plaintiff saw Dr. Beeson in a regular follow-up visit. *Id*. at 287. He had undergone a sleep study in December 2005 which confirmed Dr. Beeson's diagnosis of sleep apnea. *Id.; see also id*. at 296-97. The Plaintiff was placed on a CPAP machine and his regular medications were continued. *Id*. The Plaintiff returned to see Dr. Beeson on February 2, 2006, where he reported feeling more rested using the CPAP machine at bedtime, and Dr. Beeson noted that "[c]linically, he is

---

[9] Inflammation of the "membrane investing the lungs and lining the thoracic cavity[.]" *Dorland's, supra*, at 1306-07.

doing well." *Id*. **at 286.**  The remaining clinical notes from Dr. Beeson contained in the record are dated May through March 2007 and show that Plaintiff reported that he continued to feel well and sleep well using the CPAP machine during this period.  *Id*. **283-85.**

In regard to his rheumatoid arthritis, the Plaintiff was referred by Upper Cleveland Medical Center for a consultation with Dr. Daniel L. Kirby, a rheumatologist, on February 19, 2003.  *Id*. **at 202.**  Dr. Kirby's clinical findings were "consistent with rheumatoid arthritis . . . involving bilateral hands and wrists.  There are erosive findings involving the right ulnar stylus, and substantial joint space involvement . . . is noted bilaterally." *Id*. **at 204.**  At his follow up visit with Dr. Kirby on March 27, 2003, it was noted that after an initial, good response to the higher does of Prednisone, Plaintiff noted an increase in the amount of pain, swelling and stiffness as the Prednisone doses were decreased.  *Id*. **at 201.**  Dr. Kirby recommended that Plaintiff start "methotrexate therapy," a "slow-acting antirheumatic" drug.  *Id*.

After almost two months on the new drug therapy, Dr. Kirby noted on May 8, 2003, that Plaintiff reported no "significant improvement." *Id*. **at 197.**  Plaintiff advised Dr. Kirby that he suffered severe pain (6 on a scale

of 10) in his hands, feet, and knees and the pain was exacerbated by excessive activity in spite of continued use of prescribed medications. *Id.* Dr. Kirby also noted that he planned to initiate anti-TNF Remicade therapy "for ongoing and more specific treatment of [Plaintiff's] rheumatoid disease" unless he showed signs of clinical improvement over the course of the next several weeks. *Id.* However, this therapy was delayed until August 18, 2003, due to Plaintiff's chest surgery discussed *supra.* *Id.* **at 191-92.**

Plaintiff followed up with Dr. Kirby on October 22, 2003, after a period of receiving Remicade therapy. *Id.* **at 183.** Dr. Kirby noted the Plaintiff reported a reduction in his symptoms for about six weeks after having a Remicade infusion, but thereafter, experienced increased pain in his hands, feet, and lower back. *Id.* X-rays of Plaintiff's thoracic and lumbar spine were normal "with the exception of some mild rotoscoliosis at the thoracic spine level." *Id.* His medications were adjusted to address the "breakthrough" pain and he was to return in six weeks. *Id.*

On March 28, 2004, the Plaintiff underwent a consultative examination by Dr. Henry Igdal with Hickory Internal Medicine & Renal Associates. Dr. Igdal's impression was that Plaintiff was suffering from rheumatoid arthritis with "obvious [physical signs] of disease including the

ulnar deviations, the evidence of active synovitis[10] and some nodules. . . .

[He] has some obvious pain and decreased functional ability. . . . He has

extreme pulmonary deconditioning and observable dyspnea[11] with minimal

activity." *Id*. **at 137-40 (footnotes added).**

The next report from Dr. Kirby is dated April 28, 2004, and states:

[Plaintiff] had initially done quite well on a regimen of
methotrexate with added Remicade. Unfortunately, he has
seemingly progressively worsened with loss of efficacy
apparent from the Remicade therapy. I suspect he has
probably developed neutralizing antibodies to the Remicade as
historically he has had progressively decreased response to
the medical therapy. He continues to have moderate to severe
widespread pain symptoms. . . . [T]he Remicade seems to
simply not be effective whereas it had previously.

*Id.* Dr. Kirby recommended that a new medication, Enbrel, be substituted

for the Remicade. *Id*.

On June 28, 2004, Plaintiff advised Dr. Kirby that he was

experiencing more pain and swelling in his joints and back and that these

symptoms were aggravated by any type of use or cold weather. *Id.* **at 166.**

Dr. Kirby noted that the Plaintiff had been off the Enbrel medications due to

---

[10] "Inflammation of a synovial membrane [contained in joint cavities]
[that is] usually painful, particularly on motion, and is characterized by a
fluctuating swelling[.]" *Dorland's, supra*, **at 1645.**

[11] Difficulty or labored breathing. *Dorland's, supra*, **at 518.**

an infection located on his right hand[12] and it was his opinion the Plaintiff's increased symptoms were the result of the withdrawal of the Enbrel.  *Id*. **at 166.**  Dr. Kirby directed the Plaintiff restart the Enbrel treatment and also provided him with prescriptions for Vicodin, for breakthrough pain, and Ambien "for nighttime sleep improvement."  *Id*.

On September 1, 2004, Dr. Kirby completed a residual functional capacity evaluation based on his clinical evaluation of the Plaintiff.  *Id*. **at 158-60.**  It was his opinion that Plaintiff could sit for one hour, but could not stand or walk at all during an eight hour workday; he would be limited to lifting no more than 10 pounds occasionally, but could not carry any amount of weight; he could do simple grasping with either hand, but could not perform pushing/pulling or fine manipulation with either hand; he could not use his feet for repetitive movement; and although he could bend and squat occasionally, he could not crawl, climb, reach above his head, stoop, crouch or kneel.  *Id*.  Dr. Kirby further opined that the Plaintiff would be precluded from being exposed to unprotected heights, moving machinery, changes in temperature, dust, fumes and gases, but that he could

---

[12] Dr. Kirby removed Plaintiff from the Enbrel therapy while he was receiving antibiotics for treatment of the soft tissue infection on his hand. **Tr., at 167.**

occasionally drive automotive equipment and could occasionally be exposed to noise. *Id*. Dr. Kirby based these findings on objective signs of pain he had observed on examination of the Plaintiff such as redness, joint deformity, muscle spasms, swelling and limited joint mobility or range of motion. *Id*. These objective signs and his findings were also supported by x-rays and other clinical evidence. *Id*. He also stated that he found Plaintiff's pain to be severe and noted that the Plaintiff "has rheumatoid arthritis and a history of lung problems which are not responding adequately to treatment so far." *Id*. **at 160.**

In direct contrast to this assessment is the physical residual functional capacity assessment done by Dr. Kumar, a DSS medical consultant on August 9, 2004. *Id.* **at 150-57.** Based primarily on his review of Dr. Igdal's consultative examination in March 2004, it was Dr. Kumar's opinion that the Plaintiff could occasionally lift and/or carry 20 pounds and 10 pounds frequently; that he could stand and/or walk and sit for about 6 hours during a normal 8-hour workday; that he was not limited in his ability to operate hand and/or foot controls; that he could occasionally climb ramps or stairs; that he was able to balance, stoop and crouch occasionally; and that he could frequently kneel and crawl. *Id.* Dr.

Kumar further found that the Plaintiff suffered no manipulative, visual or communicative limitations, but that he should avoid exposure to extreme heat or cold, wetness, humidity, fumes, odors, dust, gases, and hazards such as machinery and heights.

Dr. Kumar's additional comments show that even though he assessed Plaintiff as having minimal functional limitations, he acknowledged those limitations found by Dr. Igdal, *i.e.*, that Plaintiff had difficulty getting on the examination table; he was not able to squat; he was unable to stand on his heels at all; he has difficulty manipulating small objects and his grip strength was poor; he suffers from limited range of motion in his spine, hands, hips, and both wrists; his tandem gait is unsteady; and has extreme pulmonary deconditioning and observable shortness of breath upon minimal activity. ***Id*. at 157.** Despite these observations, he opined that Plaintiff has "active [rheumatoid arthritis] on regular [follow up and medications] [with] no major complications." ***Id***. However, the Court finds Dr. Kumar's primary reliance on Dr. Igdal's one-time examination of Plaintiff tends to undermine his conclusions as to Plaintiff's exertional and manipulative limitations. In addition, Dr. Igdal, an

internist not a rheumatologist, examined Plaintiff on only one occasion, that being three years before the hearing held in 2007.

The record also contains clinical notes from Dr. Kirby regarding his continued treatment of the Plaintiff from August 2005 through March 14, 2007. *Id*. at 250-79. These notes indicate that although different antirheumatic drugs and other prescription medications for pain and swelling were prescribed, but Plaintiff continued to experience severe pain, swelling and limited range of motion despite the various drug therapies. *Id*. In March 2007, another residual functional capacity assessment was completed by Dr. Kirby's office. *Id*. at 280-82 (H. Perlin, FNP). This assessment concluded that the Plaintiff could no longer sit for more an than hour during an 8-hour workday; that he could not lift or carry any weight; that he could no longer do simple grasping with either hand; that he could only bend occasionally and was precluded from squatting, crawling, climbing, reaching above his head, stooping, crouching and kneeling. *Id*. The Plaintiff was precluded from performing all these activities due to the severe pain he suffered, along with swelling, stiffness, limited range of motion of his joints, and significant joint deformity. *Id*.

On June 15, 2005, the Plaintiff was seen by Carolina Foot and Ankle Specialists on referral from Dr. Kirby. *Id.* **at 238.** Plaintiff complained of burning pain in both feet, particularly on the bottom of his feet. *Id.* He was diagnosed as possibly suffering from "tarsal tunnel syndrome[13]/posterior tibial nerve entrapment" and a nerve block was administered to the posterior tibial nerve. *Id.* On October 14, 2005, the Plaintiff returned for a follow-up visit with these specialists and reported no real improvement in his symptoms. The medication Lyrica was prescribed. *Id.* **at 239.** Plaintiff reported improvement in his symptoms with the Lyrica medication during his November 21, 2005, visit; and during the February 21, 2006, visit, the decision was made to increase the dosage in order to "completely improv[e]" his symptoms. *Id.* **at 240-41.** Plaintiff was diagnosed as suffering from peripheral neuropathy[14] with burning pain in his feet secondary to rheumatoid arthritis. *Id.* **at 241.** Plaintiff continued to report good results with the Lyrica through 2006. *Id.* **at 243-44.**

---

[13] "A complex of symptoms resulting from compression of the posterior tibial nerve or of the plantar nerves in the tarsal tunnel, with pain, numbness, and tingling [sensations.]" ***Dorland's, supra*, at 1641.**

[14] A functional disturbance or pathological change of several peripheral nerves simultaneously. ***Dorland's, supra*, at 1132, 1330.**

During the January 9, 2007, visit, however, Plaintiff reported pain in his heels along with stinging and burning sensations after walking. *Id*. **at 245.** X-rays of his feet taken on January 23, 2007, revealed "definite erosions in the metatarsal heads, very consistent with rheumatoid arthritic changes" and he received a nerve block in the interspace near the plantar digital nerve in an attempt to relieve his pain in this area. *Id*. **at 246.**

The remaining two records from the Carolina Foot and Ankle Specialists are dated February 6 and 20, 2007, and note that although the Plaintiff reported about 50 percent improvement in the pain after the nerve block received January 23, he was still experiencing significant pain in his left foot. Both reports show that he was given injections at each visit and on January 20, 2007, it was noted that the injections had been successful in eliminating some of Plaintiff's pain. *Id*. **at 249 ("The pain . . . is better than what it was at the last visit.").**

## IV.  DISCUSSION

Disability under the Social Security Act means the inability to engage in any substantial gainful activity due to a physical or mental impairment expected to result in death or to last for a continuous period of not less

than 12 months.  In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process.  ***Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); 20 C.F.R. § 416.920.**  If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied.  *Id*.

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of medical condition, age, education, or work experience.  *Id.*  Second, the claimant must show a severe impairment.  If the claimant does not show any impairment or combination thereof which significantly limits the physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled.  *Id.*  Third, the ALJ considers whether the claimant meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4.  If so, the claimant will be considered disabled regardless of age, education, or work experience.  *Id.*  Fourth, if the impairment does not meet the criteria above but is nonetheless severe, the ALJ reviews the claimant's residual functional capacity and the physical and mental demands of work done in the past.  If the claimant can still perform such work, then a finding of not disabled is mandated.  *Id.*  Fifth, if the claimant has a severe impairment but cannot perform past relevant work, the ALJ

will consider whether the claimant's residual functional capacity, age, education, and past work experience enable the performance of other work. *Id.* If so, then the claimant is not disabled. *Id*. In this case, the ALJ's determination was made at the fifth step.

If the claimant's limitations do not allow him to perform his past relevant work but the Commissioner demonstrates that there are a significant number of jobs in the national economy which the claimant could perform, the claimant is not disabled. **20 C.F.R. § 404.1560(c)(2).** The ALJ found that the Plaintiff was not entitled to a period of disability and to disability insurance benefits under the relative provisions of the Social Security Act.

"The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step." **Burch v. Apfel, 9 F. App'x 255, 257 (4th Cir. 2001) (citing *Pass v. Chater*, 65 F.3d at 1203).** As noted, the Plaintiff carried his burden of proof on the first four steps and the ALJ so found by proceeding to the fifth step where the burden then shifted to the Commissioner.

"In questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the

expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." ***English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993).** It can hardly be claimed that an employer would look with favor on a prospective employee who has been found by an ALJ to be suffering from "rheumatoid arthritis, obliterative bronchiolitis, obstructive sleep apnea, and peripheral neuropathy" which he determined to be "'severe' medically determinable impairments." **Tr., at 16.** Nor would the employer be likely to overlook other physical problems such as poor grip strength, difficulty grasping objects, and the inability to perform fine manipulation due to the swelling and pain in the joints of the fingers and wrists. A vocational expert's testimony must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments. ***Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also, Fisher v. Barnhart*, 181 F. App'x 359, 364 (4th Cir. 2006).**

In this case, the ALJ based his second hypothetical question on the residual functional capacity assessment completed on March 14, 2007, by Ms. Perlin, a family nurse practitioner with Dr. Kirby's practice. **Tr., at 334-35; *see also id.* at 280-82.** The vocational expert testified that given these limitations, she knew of no competitive work Plaintiff would be able to

perform.  *Id.* **at 335.**  She gave a similar response when asked by Plaintiff's

attorney to consider the functional limitations assessed by Dr. Kirby in his

evaluation of September 1, 2004.  *Id.* **at 335-36;** *see also id.* **at 158-60.**

However, in the first hypothetical question, the ALJ made no reference to

limitations resulting from Plaintiff's severe rheumatoid arthritis or the effects

the disease has on his ability to walk and stand, the limited range of motion

in his hands and wrists, the shortness of breath his exhibits on exertion,

the limitations caused by his dependence on prescription medications for

control of pain, or the limitations caused by the sleep apnea as found by

Plaintiff's treating physicians.  Not only did the ALJ formulate his

hypothetical based on a state agency physician's assessment made in

August 2004 *versus* one completed by a nurse practitioner from Plaintiff's

treating physician's practice only a month before the hearing in March

2007, he afforded such conclusions "significant weight."  ***Compare id.* at**

**150-57** ***with id.* at 280-82;** *see also id.* **at 18.**

The ALJ failed to fully credit the findings by Plaintiff's treating

physicians as to Plaintiff's functional limitations caused by his rheumatoid

arthritis, the chronic lung problems, his generally poor overall physical

condition, the limitation in the range of motion of his hands, wrist, feet and

ankles, as well as other exertional limitations. "Courts typically 'accord greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.'" ***Hines v. Barnhart*, 453 F.3d 559, 563 (4ᵗʰ Cir. 2006) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 654 (4ᵗʰ Cir. 2005) (quoting *Mastro v. Apfel*, 270 F.3d 171, 178 (4ᵗʰ Cir. 1996)); 20 C.F.R. § 404.1527(d)(2).**

The ALJ also failed to afford Plaintiff appropriate consideration with regard to his severe debilitating pain which is partially controlled by potent medication. The ALJ held "that [Plaintiff's] chronic pain at a 5 or 6 is sufficient to impede his ability to perform skilled tasks . . . [but] even with that degree of chronic pain he would be able to perform the simpler tasks associated with unskilled work or low semiskilled work." **Tr. at 16.** As observed in *Hines*, subjective evidence of pain must be properly evaluated. Likewise, the ALJ failed to consider the type, dosage, effectiveness, or likely side effects of the potent medications taken by the Plaintiff. ***See* SSR 96-7; *see also*, Tr. at 159, 162, 167-68, 183, 197, 202, 204 (medical evidence supporting Plaintiff's claim of debilitating pain by Dr. Kirby); *id.* at 134-35 (same by Dr. Laney); *id.* at 140 (same by Dr. Igdal).** At no

point in his opinion did the ALJ demonstrate an appropriate realistic evaluation of the overwhelming medical evidence of Plaintiff's true disability. *See* **20 C.F.R. § 404.1527(d)(2)(I) & (ii), (d)(3) - (5);** *Winford v. Chater*, **917 F. Supp. 398 (E.D. Va. 1996).**

For the foregoing reasons, the Court concludes that the ALJ's decision is not supported by the substantial evidence of record. The Court further concludes that the ends of justice would not be best served by further hearing and delay in the award of appropriate benefits.


## V.  ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's motion for judgment on the pleadings, construed by the Court as a motion for summary judgment, is **ALLOWED**, and the Defendant's motion for summary judgment is **DENIED**.

A Judgment reversing the Commissioner and awarding benefits to the Plaintiff is filed herewith.

**30**

Signed: March 3, 2009

Lacy H. Thornburg
United States District Judge

SEALED DOCUMENT with access to All Parties/Defendants